All right. And will Council on Morales please approach? Good morning. Jonathan Easting from the State Health Defender. Good morning, Your Honors. Assistant State's Attorney Whitney Bond. All right. And Mr. Easting, keeping in mind that we have read everything, how much time would you like? Let's see if we can do it in 15 minutes, Your Honor. I'd like to hold a couple back. Let's really try. Okay. And for the State, how much time? No more than 15. Okay. All right. Mr. Easting, whenever you're ready. Good morning, Your Honors. Jonathan Easting on behalf of Ms. Mel Morales. And may it please the Court, this is one of several cases to come out of the 2007 beating death at the Tortilla Factory on 26th Street. This was an eyewitness-only case. Those two eyewitnesses were a husband and wife who identified Mr. Morales at trial as one of several participants in the beating. We're here on a summary dismissal of a first-stage post-conviction petition. Two claims are before the Court. I plan to argue both today. There's a claim of a Brady violation for the State failing to disclose that the witness expected certain immigration help with securing citizenship before and during his testimony at trial. There's also a claim of actual innocence based on the affidavit of a newly discovered witness, Victor Redding. Your Honor, I'd like to briefly note that these two claims interact under Illinois Supreme Court case law. If this Court determines that either of these claims is frivolous and patently without merit, then the remedy is to vacate the dismissal order, or I suppose the dismissal orders in this case, and then remand for second-stage proceedings of the appointment of counsel on the petition as a whole. Summary dismissals are not permitted under the Act. First, Your Honor, is the Brady claim. Almost immediately after this trial was complete, just about a month, the lead state attorney on the case sent a letter to immigration officials detailing the star witness Garcia's cooperation in the case. It's utterly implausible that this letter would have been sent without Garcia having requested it. In your brief, you say here the benefit that Garcia sought was assistance with finally securing citizenship after having been in the United States for more than two decades, and that the ASA and Garcia had a, in quotation marks, tacit understanding that Garcia was testifying for assistance. The State says that neither of these statements are supported by the record. Your Honor, here's what we can infer from the record, and here's what we have evidence of. And, of course, I ask the Court to recall this is a first-stage proceeding where we nearly meet the gist of an arguable claim, just enough to show that there's facts out there that are capable of corroboration. We don't need to prove that there was a deal. What we do need to show to show that there was a Brady violation was that the witness had some expectation of a benefit, and the State knew about that. Now, it's not plausible that this letter gets sent out of nowhere. It's sent just a month after trial, not very long after my client's notice of appeal is filed. There had to be an ask made at some point. That ask was due to be disclosed to Mr. Morales, and it never was. And we have heard of it. Some agreement was, or the ask, was made, Honor, before the time of trial. You have no evidence of it, right? We don't know the exact date that ask was made because the State hasn't disclosed it. And it would have to be in time for the defense to make use of it. So I suppose while the trial court's still in jurisdiction, so before that notice of appeal is filed. There's a few weeks gap. It's about a five- to six-week gap between the filing of the notice of appeal and when that letter actually gets sent. But especially given the standard, but we know. Well, he was sentenced on June 10th. Mm-hmm. That's correct, Your Honor. He was sentenced. The letter was July 22nd. Yeah, and the notice of appeal. You're assuming that this agreement existed before June 10th? What if it existed on June 30th? If the very first mention of citizenship, you know, only occurred after the filing of the notice of appeal, that the State had no idea through these multiple trials beforehand that he was interested in becoming a citizen, then my guy ultimately, my client would ultimately not be able to prevail on his claim. I will concede that. What we need is the opportunity to develop these facts. My guy is. So you're looking for an opportunity to determine when, if ever. That is correct, Your Honor. Is there some agreement, explicit or tacit, between Mr. Garcia and the State? That is correct, Your Honor. That's all you're looking for? We're only asking for counsel to be able to review and sharpen his petition to be able to go find these facts out. And especially on this kind of claim, this is material that would be known to the trial prosecutor. It would certainly be known to the witness. And I would point out this further as to when he first would have asked the State, did you do it before or after you testified. Okay. Now, let's assume that it occurred after he was sentenced. You would have no Brady claim, correct? Well, this is an area where the law is conceitedly unsettled. There is an open question under the law right now as to whether what happens when the State gets information that would otherwise be exculpatory, but gets that information only after trial. It's impeachment. It's not exculpatory. It's impeachment. Well, it's impeachment, but it would be Brady disclosure, obligated information that comes in sometime after trial. And even though this is an open question, there is remarkably little out there. Our opening brief cites a couple of Federal Circuit Court of Appeals cases that have stated that there still would be a duty to disclose in that circumstance. We really don't know exactly what the law is on at what point a Brady disclosure comes off. This Court, you know, when that duty would end. This Court need not decide that question given the state of the proceedings in this case. We're on a first stage. Let's assume you were able to establish that there was some either explicit or tacit agreement to provide assistance to Mr. Garcia before he testified in Mr. Morales' trial. Okay? Let's assume that. Is that sufficient to warrant a new trial where you never contested really the credibility or the sufficiency of the evidence at the first trial because both Garcia and his wife had known the defendant for three or four or five years, knew him from the neighborhood, positively identified him the night of the murder, correct? And, in fact, his affidavit in support of his post-conviction petition states that he knew them, Morales knew them, that he talked to them about immigration and disability assistance of some fashion. So don't you have to establish that if there was this, quote, tacit Brady agreement that should have been disclosed, that it would have affected the jury's verdict? We need to show that ultimately and not at a first stage, but we need to show that it would undermine confidence of the verdict or a reasonable probability or possibility of a different result. But couldn't the Court take that position at the first stage, that assuming there is this agreement, so what, basically, because everybody knew each other for three or four years and that there was never a question in your direct appeal that the credibility of these witnesses was questionable because they didn't know who he was, never seen him before? With the undisclosed material, there would be a very powerful line of impeachment. This is where the later voicemail from Garcia comes in. He says he's willing to go to jail rather than come to court in part of his quest decision. But that voicemail, the voicemail says, if you don't help me, I'm going to lie and tell them I don't know anything, which is exactly the opposite. Usually the witness says, if you don't help me, I'm going to do something else. But what he's saying is, I've been telling the truth, and you haven't helped me, and so if you don't help me, I'm going to lie and say I don't know anything. Well, one thing we have to always wonder with Garcia is, which truth is he telling? He has all sorts of different accounts when he gets into the details of this event. You know, at this trial, he says, my client's one of the ones that was carrying a rock, but then he acknowledges in a prior trial, well, I get all these guys from the neighborhood of slight build confused. No, no, no. I get all these guys in this incident confused. They were all built about the same. He didn't say everybody in the neighborhood. He never wavered in his testimony as to who was there that night. He may have wavered in his testimony as to who was there on December 4th, but honestly, he's never testified for other people being there. No, Your Honor. And in response to Your Honor's questions about the fact that he was familiar to these eyewitnesses, I submit that the fact that they recognized him for the neighborhood and maybe from that prior December 4th incident would be a reason why they might assume that he was out there in this confused scene of several people on the night of the murder. But you didn't argue that in the direct appeal. No, Your Honor. That's, I think, what Congress is asking, that you're now saying this eyewitness testimony was so weak when you never took that position in your direct appeal. Well, Your Honor, it's eyewitness testimony. Generally, most defense attorneys won't raise the sufficiency of the evidence claim with multiple eyewitnesses, even if they're the worst eyewitnesses out there, because one single eyewitness is sufficient to convict. Oh, gosh. You haven't been reading your officer's briefs lately. I have. I disagree. The, you know, I would not take the failure to show that, failure to argue that the evidence failed the Jackson standard, that, you know, no reasonable juror could have bought these witnesses at trial to be a permanent bar on the fact of materiality. I would actually submit that every defendant ever that has gotten a new trial based on a Brady violation is a case where the evidence was sufficient to convict, otherwise we're violating double jeopardy in these cases. That's why we have the remedy of a new trial and not just, you know, an outright acquit. And, Your Honor, I would like to move to the second issue raised in the briefs, which is the actual innocence based on Victor Redding's affidavit. This issue is pretty much squarely controlled by the Illinois Supreme Court's 2015 decision in People v. Allen, which tells us how do we look at affidavits in Allen. It wasn't even an affidavit. It was just a signed statement, you know, attesting to somebody's actual innocence. But Allen was a case where there was an unnotarized affidavit from a third party who said, I did it and the defendant didn't have anything to do with it. So that's actual innocence. Here we've got Redding who says, I drove by that night. I could see a bunch of individuals there. I was later shown a picture of Mr. Morales, and he wasn't one of those individuals. His affidavit does not negate Ortiz and Garcia, and so it's a sufficiency of the evidence claim. It's like maybe I would have had another witness. That's not actual innocence, is it? No, Your Honor. Mr. Redding expressed the attest that my client was not there, and there's no theory of this case under which he could be guilty if he was not there. I mean, so this looks more like the Lofton case from 2010 that went through this court where the witness attests that the defendant was not there, and that advanced to further post-conviction proceedings, or the Munoz case, which I think is also 2010, where the witness attests that he was not there. It's different, isn't it, when an affidavit says the defendant wasn't there, you still have all the witnesses who say he was there, versus an affidavit that says the defendant wasn't there and I did it, and we don't have anybody here coming forward and saying it wasn't Morales who was dragging him off the forklift, it was me. You're right. So it looks maybe more like the Illinois Supreme Court's 2009 case where the key witness testimony, because that came out of an evidentiary hearing, was that this one of the several defendants was not there. You know, our question at this early stage is taking it as true and assuming that a trier of fact would take it as true isn't enough that it would compel a different result on retrial, and it's impossible to accept his attestation that my client wasn't even there and still believe that he could be convicted. But it's essentially I as an eyewitness do not believe that I saw that person there, which is a lot different than an actual innocence claim of either he didn't do it, I did it, or he and I were in Hawaii at the time and we couldn't possibly have done it. I mean, it's just one eyewitness versus two eyewitnesses. Yeah, it would be one eyewitness versus two eyewitnesses. At this early stage, we have to take the eyewitness. Is that conclusive exoneration? If we take it as true, it is. So we look, this is where Alan's helpful. That was one new eyewitness, I think, 25 years after the fact in Alan. He says he did it, but that was, of course, contradicted by the many witnesses who testified at trial. It's the fact of contradiction is what we say. Well, there's enough here. Let's go ahead, give him an attorney to see if we can develop this claim and see if there's anything, to see if there's something actually there. And even the ultimate remedy here is after an evidentiary hearing is just a new trial. That's why this total vindication standard is incorrect. A petitioner need not show total vindication to advance an actual innocence claim. He needs to show that all the facts and surrounding circumstances should be scrutinized more closely to determine his guilt or innocence, that the evidence is so compelling as to likely lead to a different result under retrial. And we can imagine what a retrial in this case would look like. Garcia and, to some extent, Ortiz would be thoroughly impeached with this information that Garcia was seeking the immigration benefits, and it would be counterbalanced by Victor Redding's affidavit. In this kind of case, where it's an eyewitness-only case of a confusing, shifting scene, events on multiple days, there's no physical evidence at all tying my client to the event. We now have Mr. Morales' affidavit that he knows Garcia and Ortiz and, in fact, had talked to Garcia about immigration and disability. That's going to come out in the trial too, right? Yeah, there's no dispute that they knew each other, that my client knew Garcia and Ortiz from the area. The question that would come up at trial is because he was familiar with the area, is that why the witness either assumed or decided to put him in this scene? Didn't that come up in the first trial? Yes, Your Honor. That question did, but the white witnesses were not impeached with his, you know. What happened in the closing argument of the first trial is the state's up there lionizing Garcia as coming forward out of civic-mindedness and using that to bolster his testimony on what he was really actually doing, as we now know, was trying to play the state off to get benefits for immigration. We don't now know that. This is what we need a hearing to find out. It's what my client has pledged, Your Honor. I mean, I marvel at your advocacy, and it's appreciated, but we don't know that. Yeah, it's early stage proceedings. All I'm asking for is give my client counsel to be able to flesh this out, to see what exactly those states are, to figure out what the state knew when. Even if this makes it to an evidentiary hearing, it's not a long, complicated hearing. But just to make sure we have this one right, I'd ask that this Court reverse the dismissal of the post-conviction petition and remand for second stage proceedings. Thank you, Mr. Yasing. Ms. Bond? Could I have your name again, please?  Thank you. Good afternoon, I guess. May it please the Court and the counsel. It's not the state's position here today that we don't have to tender an expectation of a deal or help or any sort of tacit understanding even. It's our position here today that there was simply no, I mean, and we can call it many different things, a bona fide deal or an understanding or an expectation of help. But Mr. Morales alleges there was. He says, shortly after my sentencing, I get a copy of this letter from a defendant who is yet to be tried, pretty close in time to my sentencing. Then we get a transcript of the voicemail about a year later, where Garcia is obviously irritated with the state. And so isn't that enough for a gist? Just to say, I think there's an inference here that the state had a deal with Mr. Garcia and it may have influenced his testimony. And taking those pieces of evidence into context, neither one of those came in on this defendant's case. And as far as this defendant is concerned, what happened after the fact was tendered on the co-defendant's cases. There's nothing in this record that says at trial or prior to trial that this ASA was aware Well, that's what he wants to find out. Right. That's the whole reason for this. But you're saying he doesn't have a right to have that information. No, because what he's asking you to do is advance this to second stage based on speculation. And that's not That's not speculation. We just don't know the timing. He's already said it depends on the timing. I'm sorry. Well, and we don't know what the timing is. Well, the timing is after the defendant's trial. We don't know that. How do we know that? Because it was tendered after the defendant's trial. The letter and voicemail were tendered after. His point is, I'd like to find out whether it was known beforehand, before I got sentenced, before I had my trial, whether they had this understanding that surfaced for the first time in this written letter to INS. Okay. And I agree with you that everybody agrees that we don't know exactly when this sort of expectation or what it looked like even to So let's assume that all that happened was Mr. Garcia approached the assistant state's attorney in March. Well, it was a trial in June or something. In March. He says, you know, I could really use some help with my citizenship application. State's attorney says, we don't have anything to do with that. The fact that he approached the assistant state's attorney for help would be disclosable, right? Yes. So we don't know when. We do know the letter was written after the sentencing, but we don't know when this issue came up. And I would take, just direct your attention to the ASA himself. What the ASA did in this case was, or in this slew of cases, is after the defendant's trial was over, at some point he was approached by this witness to ask for some help. He said, okay. That's your speculation. We don't have a date. But we don't know. Right now you're saying he was approached. Okay. The question is, we don't know when. There's nothing that can tell Mr. Morales' counsel when he was approached, right? Is that true? It's fair. Okay. But that's the issue. I'm going to tie it to it. So when it comes to this ASA's behavior, let's say he is writing this letter. It's tendered after the defendant's trial. The voicemail comes in months, months later. He immediately transcribes it and tenders it to counsel. It seems odd that he's going through all of these motions to further his discovery obligations, but yet in this case, if something like that were to happen, that he would subvert his discovery obligation by stating... I think it's credibility determination. Really, it's something at second stage the state would argue in a motion to dismiss. Why would the same assistant state's attorney hide it in Mr. Morales' case and immediately release it in a co-defendant's case? I mean, that's not a first stage argument. But we're, I mean, it's entire, we're not even getting to a gist. I mean, we're all speculating about when this happened. I mean, what we're talking about, though, doesn't exist on this record for this defendant's trial. We have something that comes in after his trial. But on a Brady violation, it never does, because what the defendant says in a Brady violation is the state had an obligation to disclose. It didn't disclose. The defendant, unless it's really obvious that, you know, let's say in this case, the assistant state's attorney wrote to the INS and said, on March 1st, Mr. Garcia asked me if I would write this letter. It's now July, and I'm writing the letter. So then we would know there was a Brady violation. But in most Brady violations, the defendant couldn't possibly know when the prosecution first came into the possession of the information. Right. And we're not even, people would submit that we're not even in Brady territory, that if something doesn't exist, then you can't disclose it. How do we know it doesn't exist? Because it wasn't part of his trial record. But if I, as the prosecutor, give favorable evidence for the defendant, and I don't tell him, I don't write it down, I don't tell my partner, I don't tell anybody, right? Right. I'm committing a Brady violation, and nobody knows. After the trial, it comes to light that a witness tells somebody else or whatever, and it gets back to the defendant, that I told the prosecutor favorable evidence against the defendant, and I'm willing to write a letter to that effect. If the defendant then after trial comes in and says, I have this letter that indicates that there was Brady material that the prosecutor knew about but he never told me, don't you think he's entitled to sort of flush that out to see if it's true? The prosecutor can come back and say, not true, or, yeah, I had it. Either one. And I would agree with you if we're in a posture that this, we have evidence that it definitively happened before trial. We don't know. But I also would submit to you that this witness testified before the grand jury and testified that there were no deals. He was testifying freely. God love him. How about the day before he testified, or the day he testified at Morales' trial? True. And, again, we're not saying that this is Brady, period. But what we're saying is that this doesn't get to exist because what we have is no Brady, no constitutional claim. Would you agree that if the prosecutor before sentencing agreed with Mr. Morales that he would try to help him either with disability or immigration issues, that that would be something that should be disclosed to Morales' defense team? I think any time that something comes, any witness comes to the prosecution and says, I want this or I expect this, then that needs to come forward. If that prosecutor knows that that's what is going through this witness' mind, then, yeah, it absolutely needs to be disclosed at any time and it's ongoing. Okay. Now, we know that we don't know exactly when anything came out. But what we do know is that even if, let's say there was some sort of tacit understanding, whatever it might have been, and we don't submit that there was in this defendant's case, we're still saying that this isn't a Brady violation because when you talk about the materiality of what this issue is, why is this witness testifying, that we still don't, that small piece of a puzzle still doesn't undermine the entire credibility of the verdict when you look in context of the entire record. This court is well aware of how well this witness knows this defendant, and so well that the defendant's even saying, hey, at some point he came to me and asked me about immigration and disability. They know each other. It's never been a stranger ID sort of issue. So what you would have then is you have a witness testifying that, you know, are you receiving any sort of citizenship? And he would say, or help, or just a letter. I mean, and to be fair, I mean, this court's not – So we have Garcia saying that his memory has suffered, that he's been wanting to forget this whole incident. Who wouldn't? Well, so, again, that opens up questions regarding his testimony and the ability to get to the second stage will ferret that out. And look at what exactly – I mean, look at the one piece that we have that's concrete, this letter. I mean, what does it really say? It just says, to whom it may concern, I know this – I mean, does it? It does. In the context of judging this witness's credibility, I mean, this isn't an ASA that's bending over backwards to make sure that this citizenship is ran through. This is just via witness testifying. I asked the state's attorney, can you write a to whom it may concern letter on my behalf? Coupled against – Well, then we're making a judgment call without knowing all of it. Fair enough. I'm just pointing out that the materiality and the context in the entire record, even if it's just this small letter, that it's not going to undermine the entire credibility of the verdict when you have Garcia testifying credibly, he knows his defendant, and it's backed up by miscellaneous evidence. Again, isn't that really a second stage inquiry for the state to come in on a motion to dismiss and make that? Is that a just evaluation? I mean, when you're evaluating in context of is it a Brady violation, and we would argue it's not a Brady violation and therefore not constitutional. Any help the state gave Mr. Garcia on his citizenship application is disclosable, and it goes to impeachment. So does the trial judge need to know anything more than that to say this is enough for second stage? No. I think when you're – I mean, all the trial court has at this point is what we have. I mean, we have a very vague letter, and we have that came in after the defendant's trial, and we have – I mean, this really isn't so far out of the realm of the Roman box. When we looked at the letter itself and found that there was no prejudiced defendant because the letter in and of itself doesn't say he testified. Roman admitted guilt. Roman admitted guilt, but we also do have – A big difference. Big difference, I mean, as far as the confession is concerned. But we also have consistent and credible testimony between both Mr. Garcia and Ms. Ortiz. Oh, that's the question. You say that, but that's what the issue is. Okay. Impeachment. It certainly goes to impeachment. I – and we've never said it wouldn't go to impeachment. I'm just arguing today that despite its impeachment, it's not material to undermining the credibility of the verdict as a whole. If you have a question. To be quite clear, you're saying materiality, assuming a Brady violation, this Brady violation, taking it in its light most favorable to the petition, that at the first stage you can determine that it's not prejudicial, as opposed to saying, okay, it's a gist statement, go to the second stage and let the circuit court make a determination as to, A, was there a Brady violation, B, was it material? I'm certainly arguing that this doesn't rise to the level of gist, but I also recognize that gist is a very low threshold, at which point that's your determination. I would suggest, though, that I think it's on its face. I mean, when we just dial it back to what we really have before us is a letter that came later, after the defendant's trial was over, and that's it, to suggest that there's any sort of impropriety on behalf of this boss here, when he's gone forward and shown on these co-defendant's cases that he has been above board with his discovery obligations. I think we're trying to shoehorn sort of this idea that this help existed in this defendant's case, and in people's position, it just didn't. And therefore, if there was no help, then there would be no Brady violation, and therefore no constitutional claim to get it to that gist standard. With regard to the second issue, Redding's affidavit doesn't support actual innocence. It's meritless where it's directly contradicted by the eyewitnesses who testified at trial. The affidavit itself says that defendant was not at that location, i.e., not in his headlights. I mean, the affidavit, what it says is that I was driving along, it was dark, the area was illuminated by my headlights, and within those headlights, I saw about six people. It doesn't say specifically six. It doesn't say there's people next to the car, aside from the car, behind the car. He happened to get a look at all six of those faces and recognized that none of those six within that cone of a headlight is defendant. And then years later, he, and it's kind of unclear from the affidavit that while he is incarcerated via a jailhouse attorney, he looks at three to four Latinos and determines that none of those were Christopher Morales who was within that cone of headlights. Simply put, we recognize that the affidavit says that the faces that he saw were not defendants, but it also doesn't say that defendant was not there. It doesn't say he wasn't beyond what the headlights could illuminate. It doesn't say that he wasn't part of that group. And simply put, to the extent that I may have cited a more stringent standard, as counsel point out, even under a low gist standard, the defendant still doesn't win because this affidavit is wholly contradicted by the credible eyewitness testimony who definitively put defendant at that scene. If you have no further questions, thank you. Thank you, Ms. Frank. Yeah, I guess after. Oh, you can get up here, Mr. Uriah. You can start talking from there. I guess after how many trials and appeals on this, the state's new position that there's seven people participating in the beating and not six as I think we saw through two Roman cases and the Lopez case and how this one was actually tried. No, this headlights theory is new and certainly isn't compatible with the gist standard. On the Brady issue, Your Honor, we're at a first stage PC. This is a question as to the facts. Is my client's factual allegations fantastic or delusional? It appears that an ask was made for citizenship help at some point and it couldn't I want it to be in this very brief period between the sentencing or notice of appeal and after his testimony. But we need to find out. The way we do that is we have an evidentiary hearing. The claim should only be dismissed if this is a fantastic or delusional factual basis. This is not those kind of claims that, you know, the sort of things that fail that standard, like I can't be prosecuted because my grandfather was once a citizen of Tunisia. These sort of things that this Court sees go away all the time. And finally, I'd also point out that in Allen, the Court commented again on the first stage standards and informed that circuit courts should not be speculating reasons for dismissal. Here to dismiss on the Brady would be completely speculative. We need a hearing to be able to flesh out exactly when the request for citizenship is in the second stage. Well, we would need second stage proceedings and then eventually an evidentiary hearing. Hopefully an attorney at the second stage might be able to get the information as to when exactly that request was made that can sharpen and clarify this. My client certainly shouldn't be trapped in some of the pro se language he uses in the petition where he says the word deal when really an expectation of some assistance is definitely in there. Well, I'm just trying to be precise. You're looking for a second stage. You're not... At this point, we're requesting that the Court vacate, I suppose, both of the circuit court dismissal orders and send the entire petition back for second stage post-conviction proceedings, Your Honor. Thank you, Your Honor. Thank you. And thank you both for your arguments this morning and for your excellent briefs. We will take the case under advisement.